ENA WELCH, Plaintiff in Error, *vs.* A. A. WORSLEY *et al.*
Defendants in Error.

*Opinion filed April 21, 1928—Rehearing denied June 7, 1928.*

1. APPEALS AND ERRORS—*denial of petition to set aside finding of heirship is final and appeal may be taken to circuit court.* An order of the probate court denying the prayer of a petition to set aside a finding of heirship and dismissing the petition is a final, appealable order, and under section 11 of the Probate Court act an appeal may be taken to the circuit court for a trial *de novo* of the question as to whether petitioner is the sole heir.

2. SAME—*when Supreme Court may review questions of fact in regard to claim against estate.* Where a purely legal claim is filed against an estate, the decision of the Appellate Court on such claim, on appeal from the circuit court on controverted questions of fact, is final, but where the allowance of a claim requires the exercise of the chancery powers of the probate court and there is an appeal to the circuit court, an affirmance of the judgment of the circuit court by the Appellate Court is not conclusive as to questions of fact and such questions may be reviewed by the Supreme Court.

3. SAME—*probate court, in finding heirship, exercises chancery powers—appeal.* While a proceeding in the county or probate court for a finding of heirship is purely statutory the court in such proceeding exercises chancery powers, and on writ of error to the Appellate Court, which heard the case on appeal from the circuit court after a hearing *de novo,* the Supreme Court has before it for decision all questions of law and fact involved in the case and is not limited, under section 120 of the Practice act, to questions of law, only.

4. EVIDENCE—*alleged pedigree may be disproved by evidence of pedigree in another family.* Where a petitioner asks the probate court to set aside a finding of heirship and to declare that she is the sole heir of the deceased, whose estate is being administered, defendants to the petition, in disproving the claimed pedigree, are not limited to negative evidence in denial of the pedigree evidence of the petitioner, but they are entitled to show that the petitioner is not a member of the deceased's family by showing affirmatively, if possible, that she is a member of another family.

5. SAME—*general rule as to when declarations are admissible to prove pedigree.* Before declarations as to pedigree are admissible

in evidence it must be established that the declarant is dead, that the declarations were made before the controversy arose, and that the declarant was related by blood or marriage to the family to which the declarations refer; but such evidence is not to be excluded because living members of the same family can be examined on the same point, as it is regarded as primary and not secondary evidence, nor is it to be excluded merely because the facts may be recent.

6. SAME—*what declarations are effective denials of paternity.* Declarations of a decedent either asserting or denying paternity are admissible in evidence to establish or overturn a claim of paternity, and while evidence that an alleged parent referred to the party claiming paternity as his daughter is evidence tending to prove her paternity, such expression is not as effective to establish paternity as evidence of reference to the claimant as his stepdaughter, as established by other witnesses, is to deny paternity.

7. ADMINISTRATION—*what evidence is not sufficient to establish heirship.* A petitioner asking the probate court to set aside a finding of heirship and to declare that she is the sole heir of the deceased, whose estate is being settled, fails to establish her case where her evidence consists entirely of witnesses testifying to declarations of the deceased many years ago, without any documentary evidence whatever as to the alleged parentage, while the evidence of the defendants consists not only of contrary declarations of the deceased and of declarations as to the petitioner's pedigree in another family but of written and documentary evidence corroborating that of the defendants' witnesses, who greatly outnumber those for the petitioner and have had opportunity to know the facts.

FARMER and THOMPSON, JJ., dissenting.

WRIT OF ERROR to the Third Division of the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. WALTER BREWER, Judge, presiding.

CHARLES J. TRAINOR, and JOHN J. COBURN, for plaintiff in error.

FISHER, BOYDEN, KALES & BELL, (WALTER L. FISHER, THOMAS L. MARSHALL, JOSEPH E. WINTERBOTHAM, and JOHN F. VOIGHT, of counsel,) for defendants in error.

Mr. Justice Duncan delivered the opinion of the court:

Charles F. Swigart died in Chicago on October 17, 1917, leaving an estate consisting of real estate stipulated to be of the value of $300,000, and it is stated in the petition for letters of administration that the personal property is of the value of not to exceed $50,000. On October 18, 1917, the public administrator was appointed administrator of the estate by the probate court of Cook county. On October 22, 1917, proof of heirship was made in that court showing Emma Swigart, the insane sister of the deceased, to be the sole heir of the deceased. On August 21, 1918, Ena Welch, by Henry B. Welch, her brother-in-law, filed her claim against the estate for $10,000, in which it is stated that sum was due her for services for household work, clerical work and for looking after the deceased generally, and for which he had promised to compensate her. Welch made affidavit to this claim as her agent, in which he made the statement that "she has no other claim against said estate." On August 29, 1922, Ena filed her petition, and on December 14, 1922, her amended petition, alleging that she was born on February 4, 1869, at Chicago; that she is the lawful daughter of Swigart and her mother, Sarah Swigart, as the result of a common law marriage which was consummated by her father and mother "on or about the month of March, 1868, at Chicago;" that her mother lived with Ena's father until she died, in 1895, and that she had been informed that some time between 1888 and 1892 a ceremonial marriage was consummated between them. She prayed in her petition that the finding of the court as to the heirship in the estate of Swigart be set aside and that she be declared to be his daughter and sole heir. After a hearing on the amended petition the probate court on July 9, 1923, found that she was not the daughter of Swigart but was the daughter of Thomas James Davis and Sarah Saunders Davis as the result of their marriage in 1865; that she was born on Wolfe Island, in the province of Ontario, in 1866,

and her petition was dismissed. She perfected an appeal to the circuit court of Cook county, in which there was a trial *de novo*. The circuit court set aside the finding of the probate court and on May 30, 1924, found and adjudged that Ena was the daughter and sole heir of Swigart, as set forth in her petition. From the judgment of the circuit court an appeal was prosecuted by A. A. Worsley and William J. Roach, conservators of Emma Swigart, to this court. This court for want of jurisdiction of the cause transferred the appeal to the Appellate Court for the First District. (*Worsley* v. *Welch,* 317 Ill. 90.) That court reversed the judgment of the circuit court and made this finding of facts: "Charles F. Swigart and Sarah Saunders Davis did not enter into a common law marriage in 1868 or at any other time; that the petitioner, Ena Welch, was not born in Chicago in 1869 as the daughter of Charles F. Swigart, but that she was born on Wolfe Island, in Canada, in 1866, as the daughter of Tom Jim Davis, and that said petitioner is not the heir of Charles F. Swigart, deceased." The petition of Ena for a writ of *certiorari* was allowed by this court, and a writ of error was awarded to review the record and judgment of the Appellate Court.

The order of the probate court denying the prayer of the petition of plaintiff in error and dismissing it was a final, appealable order, and under section 11 of the Probate Court act (Smith's Stat. 1923, p. 624; Cahill's Stat. 1923, par. 341;) the appeal was properly taken to the circuit court. *Sebree* v. *Sebree,* 293 Ill. 228.

Defendants in error contend that the finding of facts made by the Appellate Court is, under section 120 of the Practice act, final and conclusive, and that this court has jurisdiction to review the record only on questions of law. On the other hand, plaintiff in error contends that the proceeding in the probate court to find a new table of heirship partakes of the nature of a proceeding in chancery and that the finding of facts by the Appellate Court is not conclusive

on this court. The jurisdiction of this court in chancery cases to review judgments of the Appellate Court on questions of fact is not disputed and there can be no question that this court has such jurisdiction, (*Fox* v. *Simons*, 251 Ill. 316,) but defendants in error further contend that such a proceeding to make a new finding of heirship is purely a statutory and in no respect a chancery proceeding. They rely on *Sebree* v. *Sebree, supra,* where this court said: "The proceeding under the statute relating to proof of heirship or to allow an award is informal. No provision is made for an answer nor any pleadings had. The proceeding here was purely statutory and is not a suit or proceeding at law or in chancery within the meaning of section 8 of the Appellate Court act, and the appeal, therefore, was properly taken from the probate court to the circuit court." The language quoted was used in construing section 8 of the Appellate Court act, and the holding was that the proceeding was not a suit or proceeding at law or in chancery within the meaning of section 8 of the Appellate Court act and that the appeal was properly taken to the circuit court. There was no question in that case of the right or power of this court to review the facts in such a proceeding to set aside a finding of heirship under section 120 of the Practice act.

Whether or not the finding of facts by the Appellate Court in this case is conclusive on this court depends upon the question whether or not, in the determination of plaintiff in error's petition to set aside the former finding of heirship and have herself declared the sole heir of Charles F. Swigart, the probate court was called upon to exercise chancery powers. The power of the probate and county courts to make findings of heirship was expressly conferred upon such courts by an act passed in 1909, entitled "An act to render valid the ascertainment heretofore made by any of the probate courts of this State and declaring the heirship of deceased persons, and authorizing such courts hereafter to ascertain and declare such heirship and

for other purposes relating thereto." (Smith's Stat. 1923, chap. 3, secs. 1, 2, 3, p. 24; Cahill's Stat. 1923, chap. 3, secs. 1, 2, 3.) The three sections of that act are as follows:

"Sec. 1. That where heretofore any courts of this State having and exercising probate jurisdiction, who may have during the progress or pending of the administration of an estate, or when administration was found either not required or necessary, or was not granted, ascertained, and by their judgment order entered of record therein, declared the heirship of any deceased person, then such ascertainment and declaring the heirship is hereby validated.

"Sec. 2. That all courts of this State, having and exercising probate jurisdiction, are hereby declared authorized and jurisdiction is hereby given to them, at any time during the progress or pendency of the administration of the estate of any deceased person, or prior to the probate of any will, without further notice; or if there is no grant of administration, then upon such notice given to all whom it may concern, in such manner as the court may direct, to ascertain, and by their finding and order to be entered of record in the court, declare the heirship of any such deceased person. The evidence upon which such finding is made shall be reduced to writing, either in narrative form or by questions and answers, and certified by the court, and shall be filed by the clerk of said court and remain as a part of the files in said cause.

"Sec. 3. That such orders of the court, declaring such heirship, whether heretofore or hereafter made, shall be deemed and taken as *prima facie* evidence of such heirship: *Provided,* that any other legal mode of proving such heirship may be resorted to in any place or court where the question may arise by any party interested therein."

It is to be noted that section 2 of the act provides that the evidence upon which a finding of heirship is made shall be reduced to writing, certified by the court, filed with the clerk and remain as a part of the files in the cause. In

330—12

this particular the proceeding partakes of the nature of a proceeding for the perpetuation of testimony, which is distinctly a chancery proceeding.

In *Townsend* v. *Radcliffe,* 44 Ill. 446, an administrator had filed his final report showing a balance on hand for distribution. The county court approved the report and ordered the balance in the administrator's hands paid to the persons legally entitled to receive it. The heirs-at-law of the deceased filed a bill in chancery against the administrator for discovery of all property belonging to the deceased at the time of her death, for an accounting, and for an order determining the owners of deceased's property and for distribution. A demurrer to the bill was sustained by the circuit court. On appeal the judgment of the circuit court was reversed by this court, holding that there is no tribunal more competent to settle such questions than a court of equity, which has a paramount jurisdiction in cases of administration and the settlement of estates and may control courts of law in their action in their settlement and distribution.

In *Grattan* v. *Grattan,* 18 Ill. 167, this court held that a court of chancery could properly entertain a bill by one of three children of an intestate to compel the two minor children of the intestate to bring into hotchpot advancements received by them during the lifetime of the intestate or be barred from participating in the estate, because courts of equity have a paramount jurisdiction in cases of administration and settlement of estates and also have plenary jurisdiction over the persons and estates of infants.

In *Rawson* v. *Corbett,* 150 Ill. 466, and *Chency* v. *Roodhouse,* 135 id. 257, this court held that the action of the county or probate court in passing upon a guardian's account is, in substance, a chancery proceeding, and that the rule that the findings of fact by the Appellate Court are conclusive on writ of error to the Supreme Court has no application. The holding was the same in a case where

the correctness of an executor's final report was challenged. (*Bliss* v. *Seaman,* 165 Ill. 422.) In all three of those cases there was an appeal from the judgment of the county court to the circuit court and from the judgment of the circuit court to the Appellate Court, and the judgment of the Appellate Court was reviewed by this court.

In *Henry* v. *Caruthers,* 196 Ill. 136, this court held that the enforcement of a co-partnership claim against the personal representative of a deceased partner is upon equitable principles, only, and that the adjudication of such a claim must be regarded as an equitable proceeding so far as the question of power of the Supreme Court to review the facts is concerned. In *Estate of Ramsay* v. *Whitbeck,* 183 Ill. 550, the law was held to be that if an allowance of a claim against an estate requires the exercise of equitable powers by the probate court the Supreme Court may review both facts and law upon appeal from the Appellate Court's judgment affirming the allowance of the claim. There was an appeal in each of the foregoing cases from the judgment of the county court to the circuit court and from the judgment of the circuit court to the Appellate Court, and the judgment of the Appellate Court was reviewed by this court.

Where a claim filed against an estate is a legal claim, purely, the decision of the Appellate Court on such a claim on appeal from the circuit court on controverted questions of fact is final. On the other hand, where the allowance of a claim against an estate requires the exercise of the chancery powers of the probate court and there is an appeal to the circuit court, an affirmance of the judgment of the circuit court by the Appellate Court is not conclusive as to questions of fact and such questions of fact may be reviewed by this court. *Starrett* v. *Brosseau,* 208 Ill. 408; *Schell* v. *Weaver,* 225 id. 159; *Zeigler* v. *Illinois Trust and Savings Bank,* 245 id. 180.

While in a probate or county court the proceeding to make a finding of heirship is purely statutory, still, in such

proceeding the county court exercises chancery powers,—
*i. e.,* powers inherently vested in courts of chancery,—and
the procedure is as in chancery. Therefore, on a writ of
error to the Appellate Court this court has before it for
decision all questions of law and fact involved in the case.

Some time before the Civil War the Saunders family
came to America and settled at Cape Vincent, New York.
The maiden name of the mother of plaintiff in error was
Sarah Saunders. She was born in 1845 in the Jersey Is-
lands, England. Her mother's name was Ann Saunders.
Her father was a soldier in the Civil War and was killed
during that war. She had two brothers—Alfred, who tes-
tified in this case for plaintiff in error, and Joseph, who
died in 1912, leaving a widow, who re-married after his
death and testified as a witness for defendants in error as
Emma Boyden. About one mile from Cape Vincent, in the
St. Lawrence river, is Wolfe Island, which is about twenty-
two miles long and seven miles wide and is the largest of
the Thousand Islands. It is Canadian territory. On the
Canadian side of the river at this point is the town of
Kingston, in the province of Ontario. In 1865 there lived
on Wolfe Island Aunt Sally and Uncle Bill Davis, who
kept a tavern, a small store, where children who attended
the school nearby made their purchases, and a dance hall,
where the young people of the island frequently congre-
gated. The Davis family was well known on the island.
Uncle Bill was quite proficient as a fisherman and was often
called Trouter Bill. One of the three sons of Aunt Sally
and Uncle Bill was Thomas James Davis, who was known
as Tom Jim. Tom Jim was well known and well liked on
the island. In the evidence he is characterized as a good
mixer and "a jolly good fellow," who had a reputation as
a good clog dancer. The two brothers of Tom Jim were
named William and Richard. Both are dead. William had
three daughters, whose names are Mary Stevenson, Ellen
Hedderson and Sarah Kitchen. All of these daughters

were witnesses for defendants in error. Richard Davis had a son, James H. Davis, now a resident of Chicago, who, as well as his daughter, Margaret McGregor, testified as a witness for defendants in error.

In the fall of 1865 Tom Jim Davis and Sarah Saunders were married. In December of that year Tom Jim was stabbed and killed in a fight in a saloon in Cape Vincent. His body was taken to Wolfe Island and laid out on the floor of the dance hall at Aunt Sally's. Defendants in error claim that some time during the first half of the year 1866 plaintiff in error was born at Aunt Sally's to Sarah Davis (Tom Jim's widow) as the daughter of Tom Jim, and that at Aunt Sally's request she was named James Ena, after Tom Jim, and was so christened at the school house nearby in 1866. For some time after Tom Jim's death Sarah continued to live with Aunt Sally and at one time engaged in the millinery business at Marysville, a small settlement on Wolfe Island a few miles from Aunt Sally's. Defendants in error further claim that Sarah went to Chicago with her child, Ena, in the latter part of 1870 or some time later. Not long after her arrival in Chicago she met the deceased, Charles F. Swigart, and they soon began living together and continued to do so until Sarah's death, in 1895, without ever being married. On the other hand, it is the claim of plaintiff in error that her mother, after engaging in the millinery business at Marysville for a while after the death of Tom Jim, went to Cape Vincent to live with her mother, where she remained until 1867, when, in company, with a friend, she went to Chicago, where she met Swigart and began living with him as his wife. She further claimed that her mother and Swigart entered into a common law marriage, and that she, plaintiff in error, was born of that marriage on February 4, 1869. It is also claimed by her that between 1888 and the time of her mother's death, in 1895, a ceremonial marriage was entered into between her mother and Swigart. The questions of fact as to whether or not

plaintiff in error is the daughter of Swigart and his legiti-
mate child and heir are thus presented.

Before considering the evidence we will dispose of a
question of law raised in the circuit court and presented
for decision in this court by the assignment of errors on
the admissibility of certain so-called pedigree evidence.

On behalf of defendants in error there was admitted by
the circuit court, over the objections of plaintiff in error,
evidence of statements made by deceased members of the
Davis family and one deceased member of the Saunders
family that plaintiff in error is the daughter of Tom Jim
Davis. The statements testified to were made by the mother
of Tom Jim, Aunt Sally, his two brothers, William and
Richard Davis, and Joseph Saunders, a brother of Sarah
Davis. It is the contention of plaintiff in error that the
circuit court erred in admitting evidence of those state-
ments. Her contention is that neither her pedigree nor the
pedigree of the Davis family is involved but only the pedi-
gree of Swigart. The main question in this record is the
paternity of plaintiff in error. She contends that she is the
daughter of Swigart. She introduced evidence of declara-
tions of deceased members of the Swigart family to prove
that she is. That was proper evidence. On the other hand,
defendants in error contend that she is not a member of
the Swigart family but is a member of the Davis family,
and they introduced evidence of the statements of deceased
members of that family and of a deceased member of the
Saunders family to prove that she is a member of the Davis
family. That evidence was also properly admitted. De-
fendants in error were not limited to negative evidence
tending to show that plaintiff in error was not a member
of the Swigart family, but were also entitled to show that
she was not a member of that family by showing affirma-
tively, if they could do so, that she was a member of the
Davis family. To make that showing the court properly
allowed them to introduce pedigree evidence of the Davis

family relating to plaintiff in error's paternity and tending to establish that she was a member of that family. In *Jarchow* v. *Grosse,* 257 Ill. 36, this court held that the general rule is that before the declarations of persons can be admitted to prove pedigree it must be established that the declarant is dead, that the declarations were made before the controversy arose, and that the declarant was related by blood or marriage to the family to which the declarations refer. It is further held in that case that such evidence is primary and not secondary, and is admissible on the ground that it is the best obtainable; that it is not to be excluded by the fact that living members of the same family can be examined on the same point, and that it is not to be excluded because the facts are not ancient but extends also to facts which have recently transpired. It is undisputed that Aunt Sally and William and Richard Davis were blood relatives and members of the same family as Tom Jim Davis, the alleged father of plaintiff in error, and that they died long before the controversies in this case arose. Joe Saunders was the brother of Sarah Davis, the mother of plaintiff in error, and it is admitted that she married Tom Jim Davis. Saunders was therefore related to Tom Jim by marriage and was a blood relative of his wife, the mother of plaintiff in error. He died long before this controversy arose. The declarations of Joe Saunders, Aunt Sally and William and Richard Davis concerning the family of Tom Jim and his wife and the paternity of plaintiff in error were competent evidence.

We do not think it is necessary to discuss the many cases cited by plaintiff in error in this case. In our judgment none of them support the contention made. Where the question involved is the right of succession to certain property in a certain family, evidence of declarations made by deceased persons relating to that family must, to be admissible, be shown to have been made by persons related by blood or marriage to that family. The evidence objected

to in this case by plaintiff in error did not refer to the Swigart family but to the Davis family. Defendants in error had the same right to introduce evidence tending to show plaintiff in error is the daughter of Tom Jim Davis that plaintiff in error had to show by such evidence that she is the daughter of Swigart.

Defendants in error also make the contention that the circuit court erred in excluding as evidence certain exhibits offered by defendants in error, to-wit, the certified copy of the death certificate of Sarah Swigart and a certified copy of the marriage license of Ena J. Davis and James A. Welch, both of which were certified by the county clerk of Cook county; also two letters written by Archibald Staley to Daniel Staley, both of whom were witnesses in this case, and which letters it is claimed by defendants in error tend to discredit Archibald Staley; further, that the circuit court erred in unduly restricting the cross-examination of plaintiff in error, and otherwise erred in rulings on the admission of evidence to their prejudice. There is merit in most all of these contentions, but in view of our decision it will not be necessary to consider any of them at this time.

As we view this case the principal and controlling question of fact is whether or not plaintiff in error is the daughter of Swigart, as she contends, or the daughter of Tom Jim Davis, as defendants in error contend. Stated ·in another form, the controlling question in the case is, was plaintiff in error born in Chicago in 1869 as the daughter of Swigart, as she contends, or was she born in 1866 on Wolfe Island as the daughter of Tom Jim Davis, as defendants in error contend. Whether or not Sarah Davis and Swigart were married is immaterial if the conclusion from the evidence is that plaintiff in error is not the daughter of Swigart. If she is not his daughter she cannot be his heir. That she is Sarah Davis' daughter is not disputed. The testimony for plaintiff in error tending to establish the fact of her birth in Chicago in 1869 as the daughter of Swigart

consisted chiefly of the evidence of residents of Chicago who knew Swigart and Sarah Davis when they lived together there. The names of her witnesses and the substance of their testimony in chief bearing on those questions here follow:

Helen Hayes is a widow, sixty-seven years of age. She went to 214 Taylor street, Chicago, to live "from 1861 to 1863" and continued to live there until 1881. Swigart moved into the Carroll house, at 243 Taylor street, "about 1869." A baby was born there in February, 1869. The baby was called Ena and was quite small when in May the Swigarts moved to the Pasdeloup house, on Halsted street, from which they moved right after the Chicago fire. Witness heard Swigart call Sarah "my wife" a number of times. The last time she saw Ena was at the Pasdeloup house about the time of the Chicago fire (1871). Ena was then about eighteen months old.

Joseph Scholl, sixty-five years old, was born in 1859. When he was between nine and ten years old he delivered milk along West Taylor street. Swigart lived either at 239 or 241 Taylor street. Witness delivered milk there in 1869. There was a baby born there in 1869 close on to spring, and when he delivered the milk another lady took it and said there was a newcomer in the house. He later saw the baby with the woman that Swigart lived with, who was called Mrs. Swigart. The first time that he saw the baby was in February or March, 1869.

Michael Wasserman, seventy-eight years of age, was a resident of Chicago. He knew Swigart in Chicago. He and Swigart belonged to a singing society in 1868 which convened each week at Turner hall. He lived a short distance from Swigart on Taylor street in 1868 and 1869. Swigart said before the birth of the child, "I think I am going to have a boy." Swigart at Turner hall, after the child was born, bought a keg of beer in celebration of the event. He remembered the occasion of the child's birth

because Swigart came to his house to get his wife to stay with Sarah until Swigart could get a midwife. The child was a girl and was called Ena. Swigart and Sarah moved to the Pasdeloup house, on Halsted street, in December, 1869. On cross-examination he admitted that he had served a term in the penitentiary on a conviction for "boodling," as county commissioner of Cook county. He said: "I didn't get anything. * * * It was a newspaper conviction." He admitted that he was "broke" when convicted, and added, "I am broke to-day." The midwife was related to his wife and is dead.

Joseph Lawler, seventy-five years old, was a resident of Evanston. He knew Swigart from 1868 or 1869 until he died. Witness was in business for sixteen years at 323 South Halsted street, beginning in 1868. Swigart bought cigars from him, and "before the big fire" (October, 1871,) came to his place of business and said: "Joe, I am a daddy; come on; I know you don't drink but I want you to have a good cigar; I am a daddy, Joe; my wife had a little girl."

Joseph Danziger, seventy-nine years old, was born in 1845. He also belonged to the same singing society as Swigart. He remembered the National Singing Fest held in Chicago in 1868. He had a conversation "during that period" in which Swigart said they would hear something new pretty soon; "aha, we will get a boy; another singer coming;" that later Swigart said it was a girl, and when they all laughed he bought a keg of beer. He saw Swigart later with a woman and a baby and Swigart said the woman was his wife.

James Arnold, eighty-four years old, a resident of Chicago, was born in Cape Vincent, New York. He came to Chicago in 1865. Swigart drove a team for him between 1868 and 1871. One morning witness and Swigart started out with a load. Swigart seemed sleepy and said, "Well, we had a baby born at our house last night; I couldn't get

much sleep." Swigart said the baby was a girl and told witness that its name was Ena or Lena. Witness thought it was Ena. In 1873 witness at his factory at Oakley street was introduced by Swigart to a lady as his wife. Swigart had the lady and a small girl with him and told witness that the little girl was his daughter, Ena. Witness did not know Mrs. Swigart was a Cape Vincent girl at that time and was Sarah Saunders from Cape Vincent. He saw Sarah again in 1883 and also Ena, who "might have been fourteen or fifteen at that time." Swigart was twenty-three years old when witness first met him, in 1866.

Wallace W. Joadwine, seventy-two years old, was born in Cape Vincent. He had lived in Chicago since 1873. He knew Tom Jim Davis but no other members of the Davis family. Sarah Davis came to Chicago in October, about 1866, on the Northern Transportation Line of steamers. She had been living with her mother at Cape Vincent for two or three months before she came to Chicago. He would not swear just the year she left Cape Vincent. She had no child when she left for Chicago. He saw her every two or three weeks before she left for Chicago. He next saw her in 1871 when she returned to Cape Vincent to visit her mother. She then had a little child with her. She said she was married to a man named Swigart and had the little girl. In 1873 witness and James Arnold and Swigart had a conversation at Arnold's box factory, in Chicago. Witness introduced Sarah to Arnold as Swigart's wife and Sarah introduced Swigart and Ena to Arnold as her husband and child. Swigart then said to Arnold: "Jim, you know when this child was born; I was working for you; this is my girl; I was working for you when she was born, when we lived down on South Halsted street." Arnold replied: "Yes, I remember you coming up there late one morning and me saying, 'Why, you are late this morning, Charley,' and you replying, 'Yes, I had a new arrival at my house last night; I had a little girl born at my house.'

Swigart then bought the drinks." Witness further stated that during a campaign in Chicago in which Swigart was running for alderman he said to Swigart, "Charley, it is rumored over at the headquarters that you and Sarah isn't married; I always supposed you were, but it is said over there that you are not married, and I don't think that is a good way to live; now, they are going to beat you for alderman on that ground—that you are living with a woman without being married to her;" that Swigart replied: "Well, I want to be elected, Joadwine; what am I to do?" Witness then said: "Go out and marry this woman and legalize her as your wife and the child as your daughter and then you can be elected, otherwise you can not." Swigart replied that he would do it, and in a week or two afterwards met witness and said: "The services has been performed and we are married; we are man and wife." He saw Sarah afterwards, and she said, "We are married." Swigart was elected alderman in that campaign and witness thought it was in 1879 or 1880, and Swigart served as alderman but one term, and that was during the World's Fair in Chicago. On cross-examination he stated that he was probably mistaken as to the year when Swigart's campaign for alderman occurred, and further said that the campaign and above conversation were probably in 1889. No explanation is given by this witness of the recital in 1873 of a conversation which took place several years before. Arnold did not refer to it in his testimony, although he did testify to the original conversation.

Eight other witnesses who lived in Chicago, Silas A. Corlett, Tibbie Church, Jennie Meyer, Bazil W. Veirs, Mrs. Henry B. Welch, Henry F. Maiwurm, Fred L. Johnson and John H. McNally, testified that they heard Swigart say that Ena was his daughter. Corlett, Church and Mrs. Welch further testified that plaintiff in error called Swigart "pa" and "daddy." Maiwurm testified that he was post-master at Forest Park. He had known Swigart since 1908. Swi-

gart was a director of the Forest Park Amusement Company and witness was vice-president of that company. Witness had been in the saloon business for twenty-five years and a member of the Liquor Dealers' Association for thirty-five years. He asked Swigart how much money he was worth. Swigart said, "I guess about $500,000." Witness said to Swigart: "Why don't you give this job to some contractor; you have got nobody to leave the money to when you die." Swigart said, "Oh, yes." Witness replied: "No, you ain't; you have no children." Swigart said: "Yes, I have a daughter." Witness said: "No; that is your step-daughter." Swigart then hit on the wall and said: "No, it ain't; that is my own daughter; my flesh and blood." Witness asked Swigart why he didn't declare she was his daughter, and Swigart said he had some good reasons, but did not tell the witness what they were. Witness did not give the dates of these conversations. Tibbie Church and Mrs. Jennie Meyer also testified that they each wrote letters for Swigart during the last illness of his wife, and also after her death, to plaintiff in error, who was then away from Chicago. Tibbie Church stated that Swigart addressed plaintiff in error in those letters as, "My Dear Daughter," and concluded them, "Yours affectionately." Mrs. Meyer stated that Swigart addressed plaintiff in error in those letters as, "My Dear Daughter Ena," and concluded them with the words, "Lovingly, your father, C. F. Swigart." Oliver Russell, a witness whose other testimony is hereinafter set forth in this opinion, also testified that he wrote letters to Ena for Swigart during this same period, in which Swigart addressed her as "Dear Daughter," and concluded them with the words, "Your loving father, Fred." None of these letters were produced in court, but according to plaintiff in error's statement they had all been destroyed. Bazil W. Veirs, who was an attorney, testified that about a year before Swigart died he spoke to witness about drafting a will for him, and Swigart

said in discussing the disposition of his estate, "I think I ought to give her [plaintiff in error] about $50,000." Witness made an appointment with Swigart to meet him at his flat and draft the will, but when they met, Swigart was intoxicated and witness did not prepare the will. He advised Swigart to make a will because "there was some question about his marriage; if he wanted to take care of that girl he better do so by will." Mrs. Eleanore Capps-Hostler and Mrs. Clara Winteroth, both of Chicago, testified that they heard Louise Swigart in her lifetime refer to Ena as Swigart's daughter. The record shows that Swigart married Louise Haas in 1901 and that she died in 1916. Mrs. Winteroth further testified that she asked Swigart what he was going to do with his money and why didn't he live and enjoy it, and he answered that he had taken care of his daughter, Ena, and she would have what he had left. Louise said, "Ena and I will never have any use out of Charley's money until he dies, because he is so tight with his money."

Oliver Russell, fifty-nine years old, was born in 1865. In 1872, when he was seven years old, he started to work for Swigart. Ena was then "just a little child—just starting to walk around," and was called by Swigart "Baby" and "Ena." She started to school in 1875, "when she must have been six years old." She was called Ena, and he asked Swigart "how it was Ena would always go as Ena Swigart and they call her Ena Davis." Swigart answered, "That was the woman's [Sarah's] foolishness—because the child would be considered illegitimate, or something." Witness further stated: "From the first time I met Ena, in 1872, until the time she went to the Brown school, in 1875, I talked to her two or three times a week. She was a nice, plain talker. I noticed a change in her manner of speech after they moved to Fulton street and she started to go to the Hayes school. That was the next year. The change was a hesitation, kind of; could not talk plain; start to

talk and hesitate; she could sing but she could not talk good." He noticed this change in her speech after she had scarlet fever.

Alfred Saunders was born in 1860. He is a section foreman for the New York Central and lives at Cape Vincent. Sarah Saunders was his sister. She went to Chicago in 1867. She lived with her mother in Cape Vincent from the spring of 1867 until the fall of that year, when she left for Chicago. She had no baby with her then. In 1871 she returned to Cape Vincent for a visit. She "went by the name of Swigart" and had with her a child called Ena, who was "about the matter of two years old." Witness visited Swigart and Sarah in Chicago in 1881. Ena then "appeared to be twelve or thirteen years old, such a matter." Swigart referred to Ena as "our daughter."

Francis E. Howard was born in 1865. He went to school with Ena in the fall of 1879. She then appeared to be ten years of age. He was possibly five years older than Ena, judging from her size. Swigart told him that Sarah was his wife and Ena was his daughter. Witness was then fourteen years old. Swigart spoke of Ena as his daughter many times.

N. C. VanSlooten had lived in Cook county forty-two years and had known Swigart since 1879. When Swigart was a candidate for alderman of the Thirteenth ward witness was president of the First primary district and member of the committee. In that campaign Dan Campbell told witness there was some talk about Swigart not being married. Witness said: "Man, that is no such thing; he told me he was married; I have been in his house and he introduced me to the woman and said it was his wife." Swigart came to a meeting and satisfied them that he was married. "So far as I know, he took a piece of paper out of his pocket and showed it to them." Swigart said at that meeting: "Why do you want to go to work and care for me; I got a daughter and I got a wife." Dan Campbell, George

McGregor, Bill Williams and Si Corlett, leaders in the Thirteenth ward, were at the meeting. They are all dead except Corlett. The contents of the paper displayed by Swigart are not disclosed by anything in the record.

Alfred Winteroth, sixty-two years old, was born in 1860. He became acquainted with Swigart in 1913. He and his wife and Swigart and his wife (Louise) visited together. He talked with Swigart two or three times about his daughter, and Swigart said he had some place to leave his money when he died. "I got a little girl—a little daughter—in California; she is an actress; she shall take care of it for me."

John J. Taylor and Charles Rice, both of whom were employed by Swigart, testified that he told them that his daughter, Ena, was born in Chicago, and that he frequently referred to her as his daughter. Rice had been employed by defendants in error. On cross-examination he stated: "Because of Mr. Worsley [one of defendants in error] falling out with me as I stated, that determined me to come in as a witness, and I then went to Mr. Trainor's office. [Trainor was an attorney for plaintiff in error.] That was the determining factor that caused me to be a witness." This witness was recalled and further testified, in substance, that when employed by the conservators he worked upon buildings owned by Worsley, and that he charged a bill for labor and lumber amounting to $146 for one of Worsley's buildings, and also a bill for hardware for another of Worsley's buildings, to the Swigart estate. These charges were made against the Swigart estate by him at Worsley's directions. Worsley testified and denied the statements of Rice. He said he told Rice to charge bills for materials and labor on his buildings to the Swigart estate. He produced his personal check for the bill for lumber for $146.37, and stated that he paid bills for the estate by checks signed by himself as conservator. William J. Roach, the other conservator, testified in rebuttal

of Rice's testimony that Swigart told him that Ena was born in Chicago and was his daughter, that he had a conversation with Rice after Rice had given that testimony. He asked Rice, "How the hell is it you didn't tell me about the daughter stuff that you testified to in the probate court in all our conversations? You always told me Swigart referred to her as his step-daughter." Rice replied: "I know I did; Swigart did refer to her as step-daughter, but I heard him say daughter when he was drunk, and I was willing to do anything to beat Worsley." George D. Kemler, manager of the Western Lumber Company, identified the books of the lumber company showing a charge of $146.37 for lumber to the Swigart estate, care of A. A. Worsley. He said the bill was paid by a check signed by Worsley. Rice admitted on cross-examination that Swigart always referred to Ena as his step-daughter when talking to strangers. He heard Swigart call her step-daughter a number of times.

Lucy A. Slosson, seventy-six years old, lived near Swigart and Sarah in 1873 and for a few years thereafter. Ena had a birthday in 1873 and Sarah said Ena was four years old. Ena was four years younger than witness' child that was born in 1865. In 1875 or the fall of 1874 Swigart came into a store kept by witness and bought a knit cap and jacket for Ena just before she started to school. Sarah told witness that her first husband's name was Davis and that he was killed. In 1874 or 1875 Ena had scarlet fever, and afterwards there was a change in her speech.

Marie L. Charlette, seventy-seven years old, knew Swigart, Sarah and Ena in Chicago. Ena was six or seven years old when she first knew her. About 1877 Sarah told witness that her girl was born in 1869—about a year after witness' boy was born, in 1868. On cross-examination witness said she first knew Sarah as Mrs. Davis and thought Swigart was her brother.

330—13

Lillian Swaufield, sixty-five years old, born in 1859, knew the Swigarts when they lived in the Pasdeloup house. They moved into that house in 1869, and there the baby, Ena, "appeared to be four or five months old." On cross-examination she stated: "The baby had a boy's name; I think it was John; it might have been John or James; I am not positive; by best recollection is that it was called Ena James or James Ena; we always called her Ena; I have talked to the mother about the child; I heard her talking to my mother when she was sewing for her; she [Sarah] said that she was married before and her first husband got killed, I think, a few weeks or very shortly after they got married, and she was living with her mother-in-law; that she told her mother-in-law that if she ever married and had another child she would name it after her first husband, whether it was a girl or a boy."

Mary Moore, born in 1857, knew Swigart and Sarah when they lived in the Pasdeloup house. (She gave no date.) She often saw Sarah going to the grocery store with a baby. She was in the Swigart flat only once, when Sarah was making a hat which she said was for her baby to wear.

Marie E. Cough, seventy-seven years old and a resident of Milwaukee, Wisconsin, was born in Cape Vincent. She and Sarah Saunders were quite friendly in Cape Vincent and visited each other often. Sarah married Tom Jim Davis in 1865. He was killed in that year. Before Sarah left for Chicago she returned to Cape Vincent from Wolfe Island and lived with her mother. Sarah left for Chicago "in October, or somewhere along there; I think it was the next fall after Tom Jim was killed." Witness never saw any signs of approaching maternity in Sarah after her marriage with Tom Jim. Sarah never had a child by Tom Jim. She never had a child with her when she left for Chicago. She saw Sarah again in 1871, when she came to Cape Vincent for a visit. She was known as Mrs. Swigart. She had a baby girl with her, about a year and a half old.

Marie E. Yates, born in 1852, lived at the Pasdeloup house, on Halsted street, when Swigart and Sarah moved there before the Chicago fire. Sarah had with her a baby three or four months old, named Ena, when witness was sixteen years old. She identified pictures of Sarah and Ena as the pictures of the woman and child she saw at the Pasdeloup house.

Julia Neagle, born in 1862, sixty-two years old, lived near the Pasdeloup house from 1866 to 1886. Before the Chicago fire she often went with her mother, who did sewing for Sarah, to the Swigart home. Sarah, Swigart and the child lived together in the Pasdeloup house, and when she first knew it "the child was a year and a half old—just beginning to walk."

Fred Arnold, born in 1868, had lived in Chicago fifty-one years. He went to school with Ena in 1875 and was in several classes with her at the Hayes school. He knew her as Ena Davis and also as Ena Swigart. She was about his age, or five or six months younger. Witness was seven years old when he started to school. He knew Ena a year or more before she started to school. He first knew her as Ena Swigart and when she started to school knew her as Ena Davis.

Chirstine Bohan, born in 1863, said that "between 1869 and 1870," when witness was "around between six and seven years old," she held a child on her lap at the Pasdeloup house, 417 South Halsted street, and let it fall. The child was not more than two years old. The child's mother was called Aunt Sarah. She remembered the incident because she let the child fall. She didn't know "whether it was in Swigart's house or not," because she didn't remember the name.

Frank B. Gay, born in 1867, went to school with Ena when he "was possibly six years old." He could not recall the year. He believed she was a "couple of years" younger than he. I knew her "by the name of Ena Swigart and

Ena Davis." He did not remember to what grade he belonged in school when he first met Ena, but thought he was in the sixth grade.

Stephen M. Major, born in 1870, met Ena "on the sidewalks in front of our houses; that was probably in 1878, 1879 or 1880." She appeared to be "a year or so older than I; I don't know." He played with Ena. He heard Swigart refer to her as his daughter.

Mrs. Elizabeth Best, sixty-eight years old, born in 1855, before the Chicago fire knew Swigart and his wife—"that is, I knew who she was." She saw the wife in Turner hall "sometimes every week, sometimes only once in two or three weeks." She saw a baby with Sarah as often as she saw Sarah. In the early summer before the Chicago fire the baby appeared to be six months old.

Plaintiff in error testified under the name of Ena Welch that she lives at 51 First street, Weehawken, New Jersey. Her father was Charles F. Swigart. She learned that he was her father from what her mother told her. When she was a very little girl her mother told her to address or call Swigart father. Later, when she started to school, her mother told her he was her uncle and for her to call him Uncle Fred. She first went to school in Chicago in the fall of 1876. Her mother took her to school and told her to take the name of Ena Davis. She heard her father (Swigart) and her mother talk about where she was born. She heard him talk about her being born in Chicago. Her name was Ena Davis when she was married. She never went by any other name than Ena. She never had any other name than Ena Davis. She never went by the name of James Ena Davis, and never before she was married wrote her name as James Ena Davis. She has written her name as Mrs. James Ena Welch. She took that name after her husband died. Her husband's name was James A. Welch. She had a hesitation in her speech in 1875 or 1876, after she had scarlet fever. From a time as far back as she can

remember, and up to 1887, she heard her mother repeatedly ask Swigart to marry her. The first time she ever knew that her mother and Swigart were married was in 1893, when she came home to visit them. Her mother told her during that visit that they were married. Witness further stated that she visited Wolfe Island in 1881 but never after that time. She was then about twelve years old.

The evidence for plaintiff in error and the other evidence in this record establishes it as a fact that Charles F. Swigart lived with her mother, Sarah E. Davis, in Chicago from the time he first met her there until shortly after he became a candidate for alderman, in about 1892, and that they sustained an illicit relation with each other. Plaintiff in error, to whom we shall hereafter refer as Ena, testified, in substance, that Swigart and her mother were not married previous to 1887—the year in which she herself was married and left home; that as far back as she could remember she heard her mother ask Swigart to marry her, and her mother from that time until 1887 almost daily asked Swigart to marry her; that the first time she learned her mother was married to Swigart was in 1893, when she came from New York to Chicago to visit her; that all she knew about their being actually married was, that her mother told her on that visit they were married. There are records or writings that tend to show that Swigart and Sarah were not married before 1890. Those records or writings consist of about twenty-five deeds and mortgages executed by Swigart between July 10, 1875, and July 12, 1890, and recorded in Cook county, in all of which he was described and certified as "bachelor" or "a bachelor." In two of the mortgages, dated October 2, 1880, and October 6, 1880, respectively, there were provisions that "in case of a bill being filed to foreclose, that Mrs. Sarah E. Davis, or other suitable person, may be appointed receiver, with power to collect the rents," etc. It is not questioned that the Mrs. Sarah E. Davis mentioned in these mortgages was

the mother of Ena and the woman with whom Swigart was then living. The evidence in the record for Ena tends to prove that Swigart and Sarah were married about 1890, and that about that time Swigart stated that he was married to her and afterwards recognized her as his wife. In 1897, 1898 and 1899, after the death of Sarah and before he married Louise Haas, in 1901, Swigart executed four other deeds, in which he is described and certified as "Charles F. Swigart, a widower." Swigart caused to be prepared and inserted in the *Chicago Tribune* an obituary notice that his wife, Sarah Elizabeth Swigart, died on November 1, 1895, and would be buried at Concordia Cemetery on November 3, at one o'clock. The records of the Concordia Cemetery show that Sarah Elizabeth Swigart was buried on November 3, 1895. Ferdinand J. Arnett, an undertaker, testified that S. A. Moffatt, the undertaker for whom he worked, made up the death certificate at the direction and upon the information furnished him by Swigart. A copy of that death certificate is in the record, reciting the full name of the deceased is Sarah E. Swigart; that her birthplace is in England; that she had lived in this State for twenty-two years; that she was a housewife; that the cause of her death was typhoid pneumonia, and that the place of her burial was Concordia Cemetery.

In view of the evidentiary facts aforesaid and other evidence in the record we would not be disposed to set aside the finding of the circuit court that the mother of Ena was the lawful wife of Charles F. Swigart at the time of her death if it were necessary for us to pass on that question. Furthermore, for the purposes of this decision we will assume that the established facts are that Swigart lived with, but was not married to, Sarah E. Davis from the time he began living with her until after he became a candidate for alderman in Chicago, and that during his candidacy for that office he was lawfully married to her, that he lived with

her from that time up to her death recognizing her as his wife, and that he buried her as such.

Of the witnesses above set forth as testifying for Ena, seventeen of them testified that they had heard Swigart call or refer to Ena as his daughter. One of the seventeen, Henry F. Maiwurm, testified that Swigart said to him that Ena was his own daughter—"my flesh and blood." Three of the seventeen, one of whom was Ena's brother-in-law, Henry B. Welch, testified that they had heard Ena call Swigart "pa" or "daddy." Two of them testified that they had heard Louise Swigart, his second wife, refer to Ena as Swigart's daughter. Four of those witnesses further testified that after the death of Louise, when Swigart's health was failing and his sight was very poor and he was unable to write letters for himself, they at his request wrote letters for him to Ena, who was then living in New York. Swigart wanted Ena to come to Chicago, and those letters written to her for him made known to her such wish. Those four witnesses in their evidence stated, in substance, that at Swigart's suggestion they addressed Ena in the letters they wrote for him as "Dear Daughter," or "My Dear Daughter," and that the letters were concluded with the words, "Your loving father," or, "Yours affectionately." Those letters were not produced in court for the reason that they had been long destroyed by Ena, according to her testimony.

The evidence of the seventeen witnesses aforesaid to the effect that Swigart called or referred to or addressed Ena as "Daughter," or "Dear Daughter," and that Ena referred to him as "pa" or "daddy" or addressed him as "pa" or "daddy" is one main part of Ena's evidence upon which the claim for her is based that she is, in fact, his daughter. If that evidence were the only evidence in the record bearing upon that question it would certainly be sufficient to establish as a fact that she is his daughter and that she is now his heir. Taking into consideration the fact that there

are many witnesses whose testimony tends strongly to prove statements by Swigart that are entirely inconsistent with the idea that she is, in fact, his daughter and heir, we are led to believe that, conceding that he actually called and addressed her as his daughter at the various times mentioned by these seventeen witnesses, he at no one of the times mentioned by them really intended to be understood as speaking of her as his actual daughter or child except the time when it is testified by Maiwurm that he made the emphatic declaration that "she is my own daughter—my flesh and blood." But whatever the fact may be as to Swigart's purpose or intention in making any or all the declarations aforesaid, if he did make all of them, the evidence for defendants in error (herein referred to as defendants) establishes beyond all question that she is not the daughter and heir of Swigart. There were more than one hundred and twenty witnesses who testified for the defendants whose testimony tended directly to overthrow or to refute the claim of Ena that she is the daughter and heir of Swigart. In addition to the testimony of those witnesses bearing on that question there were eleven or more written documents or writings admitted in evidence that are entirely inconsistent with such claim of Ena, and at least one other written document or writing of the same effect that was offered in evidence by the defendants and erroneously excluded by the circuit court. After all of the admitted evidence for the defendants is fully considered, we are forced to the conclusion that the finding of the circuit court that Ena is the daughter and heir of Swigart cannot be sustained, for the reason that the finding is against the manifest weight of the evidence. In presenting and discussing the evidence of the defendants' one hundred and twenty-three witnesses, and its character and force, we deem it inadvisable and unnecessary to set forth in this opinion a substantial narrative of the testimony given by each and all of such witnesses, or even the material facts to which

every such witness testified, in the extended manner that we have set forth the testimony of the thirty-nine witnesses who testified in chief for Ena. We will therefore simply state a few of the historical facts that are undisputed and which are necessary to understand the defendants' evidence, with a general statement of the material facts sought to be proved by the defendants and the number of witnesses testifying to each set of such facts, and only set forth the testimony of a few of the witnesses to illustrate the general character, purpose and force of the defendants' evidence.

The residents of Wolfe Island from and before 1865 to 1923 and 1924—the years during which the evidence in this case was heard by the probate and circuit courts—were mostly land owners and farmers. A few of them were sailors, who were away from the island and engaged in their occupation a very great part of the time, and some of them were witnesses in this case. Among the earliest settlers of the island were members of the Grimshaw family, after whom Grimshaw Bay was named. They were generally large land owners, and several of that family testified for the defendants. In 1865 among the old residents of the island were Uncle Bill and Aunt Sally Davis, who were picturesque and well known characters. They owned and farmed 50 acres of land adjoining or near Aunt Sally's place, over which she presided and on or near which she ran a tavern, a dance hall and a store, where the school children and the residents of the island made purchases and gathered for dancing and other amusements. Aunt Sally and Tom Jim, one of her sons and the admitted first husband of Ena's mother, were very popular, well known and well liked by the people of the island and many others not living on the island. Tom Jim was particularly well known at Cape Vincent, where he attended many dances and where he married Ena's mother in the latter part of the summer or in the fall of 1865 and brought her to Aunt Sally's place, where he and his wife resided until his tragic death and

where his widow resided for a considerable time after his death. The special reasons given by various witnesses for his pouplarity are, that he was a leader in all character of amusements and a very accomplished dancer. It is said that he was also popular with all the women and that they were glad of an opportunity to dance with him. His tragic death and his largely attended funeral that followed were such as to indelibly stamp upon the minds of the men, women and children who knew him, a memory of him and what he did, so vividly that there were few, if any of them, even at the time of the trial in the lower courts, who could not readily recount the various things they had seen him do and heard him say and the fact of his death in December, 1865. It was these same reasons that a great many of the witnesses gave for their being able to know and to remember quite well his widow, Sarah E. Davis, and where she lived after the death of Tom Jim, and whether or not she had a child born to her shortly after his death, and whether or not she carried the child with her when she left Wolfe Island and vicinity and went to Chicago. The defendants' contention is that Sarah lived with Aunt Sally as long as the latter continued to live on the island. Uncle Bill died in 1870. In about 1871 Aunt Sally sold her farm and all her real estate property, including her tavern, store and dance hall, and moved away from the island to or near Craighurst, Ontario, where she died in 1874.

The facts that Sarah E. Davis lived on Wolfe Island with her husband, Tom Jim Davis, after their marriage and until his death at the home of his parents, and that she resided with his parents after his death, are not disputed by Ena or any of her witnesses. The facts that Sarah went to Chicago after she left Aunt Sally's place and Wolfe Island and vicinity and began living with Swigart some time after she arrived at Chicago, are not disputed by the defendants. The fact that Ena's mother never had but one child born to her and that the child went by the name of

Ena Davis, and that the same Ena Davis was the plaintiff
in the lower courts under the name of Ena Welch, are also
facts that are not in dispute in this suit. The real and con-
trolling questions in this suit are: (1) When did Ena's
mother go to Chicago? (2) Did she take with her to Chi-
cago her daughter, known as Ena Davis? (3) Was Ena
born in Chicago or in Canada? The ultimate fact to be
determined is, Is Ena the daughter and heir-at-law of
Charles F. Swigart? If Ena was born in Canada in 1866,
as the defendants contend, she cannot, under the evidence in
the record, be the daughter of Swigart. If she was born
in Chicago in 1869, after her mother went to Chicago and
began living with Swigart, as Ena contends, she is, under
the evidence in the record, his daughter and heir. The dif-
ference in the contentions of the parties as to the date of
Ena's birth is a mere matter of three years. Ena contends
that she was born February 4, 1869, and the defendants
contend she was born in 1866, and one of their witnesses
fixes definitely the date of her birth as February 4, 1866.
The further undisputed facts are that Ena and her mother
were living with Swigart in Chicago at the time Ena was
married to James A. Welch, in 1887, and that they had all
three lived together for about fourteen years prior to Ena's
marriage. She left that home about July 20, 1887, after
she married Welch. He died a few years later, but she
did not return to Swigart's to live but went on the stage,
and the part on the stage that she engaged in for a while
was singing. Later her employment on the stage was as
wardrobe mistress. In 1915, in an application for life in-
surance with the Prudential Insurance Company, she was
described as "Costumer," and so far as the evidence shows
she is still operating in that capacity. The evidence for the
defendants tends to show that in January, 1902, Ena was
with the troupe known as the Dolly Varden Company, and
that that company played at Kingston, Ontario, in that
month, and that in 1913 she was again at Kingston with

the Madam Sherry Show, which gave a performance during that year at Kingston.

On November 7, 1901, Charles F. Swigart married Louise Haas, of Bremen, Indiana. She died in 1916. After her death he was very lonely and disconsolate, and in 1917 he began to lose his eyesight, and finally reached a condition of helplessness so far as his individual efforts were concerned. Those facts were made known to Ena by letters written to her for Swigart by Worsley and in which Swigart undertook to induce her to return to his home in Chicago and care for him, but she steadfastly refused to do so. Those letters and Ena's replies thereto, and other letters of Ena to Swigart, were identified and introduced in evidence by defendants, which will later be referred to in this opinion.

In direct conflict with the conclusion we are asked to make that Ena is Swigart's daughter, and from the oral declarations of Swigart and of Ena and of Louise Swigart to the effect that they had heard Swigart call Ena his daughter and had heard Ena call Swigart "pa" or "daddy," as testified to by seventeen witnesses, is the testimony of thirty-one witnesses for the defendants to declarations of Swigart and his second wife and of Ena and her mother, to the effect that Ena was not his daughter but that she was his step-daughter and the daughter of Tom Jim Davis. All of the thirty-one witnesses were either residents of Chicago or its near vicinity, or former residents thereof, or residents of Indiana and relatives of Mrs. Swigart. They all knew Swigart very well, and most of them were neighbors and friends who had been on intimate terms with him. The others were Mrs. Swigart's relatives and residents of Indiana. Fourteen of the thirty-one witnesses, and Ena's witness Rice, testified that Swigart called or referred to Ena as his step-daughter. Three of them testified that they had heard Swigart say that Ena was not his daughter. Three of them testified that they had heard Louise Swi-

gart say that Ena was Swigart's step-daughter. Twenty-
four of the defendants' witnesses testified that they had
heard Swigart say that he had no child or children, often
regretfully. Eight witnesses for the defendants testified
that they had heard Swigart refer to Ena as "Sarah's
daughter." It is established by the testimony of thirteen
witnesses for the defendants and of four witnesses for Ena
that she was called and known in school as Ena Davis. Ena
testified that she never went by any other name, and never
had any other name before she was married, than Ena
Davis. She also testified that she never went by the name
of James Ena Davis and never before she was married
wrote her name as James Ena Davis. Nevertheless she ad-
mitted that she had written her name as Mrs. James Ena
Welch since she was married, and stated that she took that
name after her husband died, although his name was not
James Ena Welch or James E. Welch but was James A.
Welch.

Among the thirty-one witnesses was Henry R. Baldwin,
of Chicago, who had practiced law for thirty years in that
city. He testified that in 1888 or 1889 he resided in the
neighborhood where Swigart then lived. He met Swigart
often and visited at his house. At one time he and his wife
had dinner at Swigart's home with a number of friends, of
whom he mentioned Mr. and Mrs. J. D. O'Connor and Mr.
and Mrs. Rhoades. He met there the woman with whom
Swigart was living, known either as Mrs. Swigart or Mrs.
Davis. He did not remember by which name she was usu-
ally called. Swigart, or the woman with whom he lived,
(he did not remember which one of them,) when witness
and they were talking together, told him that Ena was en-
gaged in some work, but just what it was he did not recall;
that Ena had a desire to be independent; that Swigart had
offered to make a home for her at his home if she cared to
come there, but that she was independent and did not want
to do so and wanted to support herself. Some years there-

after—about the time of the death of her mother—he met Ena at Swigart's home. At that time he talked to Ena and Swigart. Swigart introduced him to Ena and told him that she was the daughter of Mrs. Davis' husband, calling Davis by his full name, whatever it was. Either Swigart or Ena in their conversation with him said that her father died when she was a baby or before she was born. He was not sure which of those statements was made. Ena then told him either that she had no recollection of ever seeing her father or that she never did see him. This testimony of Baldwin is not controverted by anyone and was not denied by Ena, although she was several times on the witness stand.

Another witness for the defendants, Amy Ellen Jenkins, a widow sixty-two years of age and a resident of Chicago, testified that in 1887 she rented a flat in Chicago from Swigart for three years and during that time lived in that flat, which was in the same building in which he lived. She stated that Ena's mother and she visited each other and that Ena's mother came to her flat almost every day. She further stated that Ena's mother told her that Ena's father, Tom Jim Davis, was stabbed to death, and that Ena was born in her mother-in-law's home; that Ena's mother further told her that she was a bride, a widow and a mother inside of a year, and that she left her mother-in-law's home when Ena was about three or four years old, or something like that, and afterwards came to Chicago.

One of the thirty-one witnesses, Rev. Arthur Hoffman, the Presbyterian minister who conducted the funeral and preached the sermon for Mrs. Louise Swigart at the Masonic Temple, testified that he talked with Swigart in front of his home, in the summer of 1916, with reference to his status in his own home. Having been informed by Swigart that he had written to his step-daughter, Ena, he asked him if she was coming to keep house for him, and he said that she had refused.

Mrs. Nellie Hunt, of Chicago, who lived in Swigart's California and Lake apartment building for seven or eight years, testified that Swigart told her that he never had a child; that his common law wife (Ena's mother) had a child when he married her, and that the child was small when she came to live with him—about six or seven years old. Margaret Koontz, a sister of Mrs. Swigart, testified to the same effect, and the testimony of many of the Wolfe Island and Canadian witnesses, which will be considered later, is to the effect that Ena was born on Wolfe Island in 1866; that she and her mother lived there with her grandmother until 1871, and that about 1872 or 1873 her mother came to Chicago with her.

Some of the most convincing evidence for the defendants is written or documentary evidence. Mrs. Koontz, the witness above mentioned, testified that Swigart at one time loaned her husband $300, the note for which was never fully re-paid. That note was introduced in evidence. On the back thereof was the following memorandum written by Louise Swigart and signed by Swigart:

"CHICAGO, *January 6th, 1914.*
"I, Charles F. Swigart, so far as I am concerned, I cancel the within note which you see is *bona fide* by your husband's signature. If anything should happen to Lou or my step-daughter, Ena Welch, so that they might want assistance, and if in your power, you will assist them so far as you are able.          CHARLES F. SWIGART."

It was proved without controversy that Swigart signed the above memorandum, also introduced in evidence with the note.

There were quite a number of letters of Ena to Swigart in evidence that were proved to have been written by her to him. In none of those letters did she refer to Swigart as father or to herself as daughter. In some of them she addressed him as "Mr. Swigart," in others as "Dear Fred," and in still others as "Dear Mr. Swigart."

Ambrose A. Worsley, one of the conservators of the Emma Swigart estate and one of the attorneys for the defendants, was a close friend of Swigart during his lifetime. After the death of Mrs. Swigart, when Swigart was nearly blind and helpless, Worsley wrote letters to Ena urging her to return to Chicago and look after Swigart. In his letter to her of June 27, 1917, he said: "In whatever manner he has looked at you in the past, certainly he now considers you in the light of his own child; that is, he certainly would think as much of you as if you were his own child if you would show a disposition to assist him now. If he should die, as he may at any time, without making a will, let me again call your attention to the fact that his affairs will go into the hands of our public administrator, and there is no way whereby you can get a cent." In her reply to this letter Ena did not say or intimate that she was Swigart's daughter. She spoke of Swigart being parsimonious and of her unwillingness to return to Chicago to live the kind of life that her mother lived with him. She further said: "Now understand me. I do not mean to be unkind, but before I make any move that means my whole life and give up $30 a week, and $3 a day even at home making gowns or sewing, I want to know for what I do it. * * * I don't want you to think that I am doing this for any motive but to protect myself. It is the first time ever in my life I have spoken this way, but I told you in Chicago I must know something different. If I was there and he should be killed, or any accident, it would be the same thing, and at my time of life I cannot risk all on a chance and live like the other poor souls [referring to her mother and Louise Swigart] have lived. Never go out, even a poor cat dare not come on the stairs for milk if he knew it (one day I was there) and always be home for the phone. Never a penny to call your own. Rather a crust of bread than live like that. And I could not live in the Park avenue flats, as I have seen too much misery there. * * * You

can read this letter to him if you want to, only don't speak
of my saying if he is ill unto death, as I would not hurt
his feelings, and if you knew all the hardships that I knew
both poor souls have had, you will understand one cannot
give up everything for nothing. * * * If anything should
happen to him I will come, if I possibly could, but I cannot
make myself absolutely miserable all my life even for pity,
and that's all I have left, as my young life was far from
happy, and childhood I never had any."

Worsley answered Ena's letter on July 9, 1917, and
again urged her to return to Chicago. In that letter he
told her that he had carefully considered the contents of
her letter and that he would not show the letter to Swigart.
He then asked her to write Swigart "one of your kind let-
ters, simply telling him that you have received a letter from
me." He further told her that he did not think it would
be wise for him to show Swigart the letter which she had
written to him (Worsley). Ena replied by writing a letter
to Swigart. She addressed him as "My Dear Fred," and
then said: "Mr. Worsley has written me and I don't know
what to say. I have work to be done until the first of Au-
gust and might try and come to see you, but, Fred, to live
there I would be in my grave in a year. Nobody seems to
know how I feel, and if I could get you fixed comfortably
and if you would only live in some nice, quiet hotel and
take the rest of your life and live like you should at your
time of life, I would move you and fix you up in a nice
place; but, Fred, don't ask me to live like that. Everybody
thinks I am heartless and unkind, and I am not crazy about
the theatre, but just think of what has been and how I must
feel. It is like going into a living death to me. I would try
and come on during August and move you into some place
if you would be comfortable, and it does hurt me so to say
it, and I do wish you would be like I want you to, Fred.
You cannot take anything with you and why not enjoy what
you have worked so hard for? None of us know how long

330—14

we all live, and try and get a little happiness out of your life. They [referring to her mother and Louise Swigart] never had it, Fred, and it would make them happy to know you could do so much good with your money if you would only be different. * * * I don't want you to live in all that dirt and have someone to wait on you. * * * Enjoy what you have worked so hard for, while you have the chance, and think of their lives. I will close for now, Fred, and say good bye. Answer."

The letter was signed simply "Ena," without the use of any other words whatever expressing love, affection or any other sentiment as shown above.

Another written document that is inconsistent with the claim of Ena that she is Swigart's daughter is the claim that was filed for her in March, 1918, for $10,000 for household services, against Swigart's estate, the particulars of which we have already set forth in the first part of this opinion. It was not until more than four years after that claim was filed that she filed her petition claiming to be Swigart's daughter and heir. The claim was never allowed or disallowed by the probate court but was impounded and introduced as evidence for the defendants in this case. The explanation of Ena of the filing of this claim is, that after Swigart's funeral Worsley returned with her to the home of Mr. and Mrs. Henry B. Welch and took dinner and spent the evening there. There, according to the explanation, Worsley told Ena that he would look after her interests in the estate. The following spring, not having heard from him, Ena came to Chicago, went to his office and was there informed by him that he was representing Emma Swigart, and that she could not inherit the estate because she (Ena) was only an illegitimate daughter of Swigart. She further claims that she communicated this information to her brother-in-law, Welch, who went to see Worsley, and was told that "Ena didn't have a leg to stand on," because she was Swigart's illegitimate daughter. Later, according to

the explanation, Worsley sent for Welch and told him that it was to be regretted that Ena could not obtain some of the estate, and that if she would file a claim against the estate for $10,000 for wages he would see that it was allowed and paid. The insistence, however, is, that Welch, without advice from Ena or communication with her, prepared, signed and caused the claim to be filed and afterward notified her of what he had done. This explanation and contention caused Worsley to take the witness stand, although he was an attorney in the case, and he denied *in toto* any of the statements that were attributed to him, and he was corroborated by the testimony of his two sons and by other evidence in the case. He was further corroborated by the fact that very shortly after the death and funeral of Swigart, Ena and Welch consulted several attorneys in Chicago in regard to her claim, and that the affidavit to the claim filed was made before Julius H. Quasser, one of the attorneys who were consulted by Ena and Welch. We do not think that the evidence sustains the claim that Worsley made the declarations attributed to him or the suggestions with reference to the filing of Ena's claim against Swigart's estate.

There was also admitted in evidence for the defendants the application for life insurance in the Prudential Insurance Company of America, signed, "Mrs. James Ena Welch." Ena admitted that she signed the application on November 29, 1915. In this application the place of the birth of the applicant is given as Canada and the date of her birth as February 4, 1875. The agent for the insurance company testified that the application was signed in his presence, and prior to the time the application was signed he wrote it, and the answers therein found, in accordance with the directions of Ena in answer to those questions. Ena denied on the witness stand that she gave the information contained in the application, but stated that it was signed by her in blank, and that her answers to the ques-

tions were inserted by the agent afterwards and without her knowledge. Her evidence in this respect is directly at variance with the testimony of the insurance agent, who, so far as this record shows, was a wholly disinterested witness. The date of her birth given in the application does not correspond with either the date of her birth as contended by her in this suit, or with the date of her birth as contended by the defendants. This latter fact is commented on by her counsel as favorable to her contention concerning the application. We cannot understand how that fact can benefit her. If she stated the date of her birth incorrectly in the application she evidently knew that she had done so. and the effect would only be to secure to her insurance at a cheaper rate than she was entitled to have, which would be a fraud against the company. It could benefit neither her nor the company to state that her birthplace was Canada, and if she so stated, the natural inference must be that she stated the truth as she then understood it.

Another exhibit introduced by the defendants was a page from an autograph album of Julia A. Coffee, known as Lucy DuBois Coffee. In that album, on request, Ena wrote as follows:

*"Dear Lucy.*
"Be corteous to all and intimate with few.
                    "Your Friend,
July 20/87."                    JAMES ENA DAVIS.

The proof shows without question that the above lines were written and signed by Ena as James Ena Davis on July 20, 1887, the day she was married to James A. Welch and just before her wedding took place. The above writing contradicts her testimony to the effect that she never went by the name James Ena Davis and never before she was married wrote her name as James Ena Davis. It is also in conflict with twelve other of the defendants' witnesses, who testified that they knew her on Wolfe Island

as a child and as the daughter of Tom Jim and Sarah E. Davis, and that her full name was James Ena Davis.

Sarah E. Swigart's mother and Ena's grandmother, Ann Monroe, formerly Ann Saunders, wrote a letter to Swigart on August 4, 1897, at Cape Vincent, which was mailed on the same date in an envelope addressed to Swigart, as shown by the post-mark on the envelope. The letter and the envelope were both introduced in evidence by the defendants. In that letter to Swigart she told him about having gotten a letter from Ena in which Ena had written her that she had sold both of the fur or mink coats to the man "poor Sarah bought them of," and that she gave as a reason therefor that the man would not buy one without the other. These fur coats belonged to Ena's mother before she died. Mrs. Monroe further stated in her letter that she thought that the death of her mother would have made Ena give up the stage. She referred to the above matters in her letter apparently with very much regret, but later in her letter she said, in substance, that at the age of thirty-one years Ena was old enough to know her business. This declaration of Mrs. Monroe, who died years before the death of Swigart, to the effect that Ena was thirty-one years old in August, 1897, made to Swigart, who never, according to the evidence for Ena, met her mother previous to the year 1868, is an equivalent declaration to Swigart that Ena was born in 1866 and that she was not his child—"his flesh and blood." This letter tends not only to refute the claim of Ena that she was born in 1869 as the daughter of Swigart, but it, with all the other evidence for the defendants to which we have alluded, absolutely overwhelms the evidence of Ena's seventeen witnesses to the effect that Swigart referred to and called her his daughter and that she referred to and called him "pa" or "daddy," including the very emphatic declaration of Swigart testified to by Maiwurm that Ena was his daughter— his flesh and blood.

We may say further with reference to the testimony of the seventeen witnesses, that it is not by any means unnatural for a step-father to habitually refer to and call his step-daughter "daughter," or for his step-daughter to call her step-father "pa," or "daddy," or "father." On the other hand, it would be very unnatural for the actual father of a female child to refer to and call her "step-daughter," and it would be also unnatural for her to refer to and call him "step-father." The declarations of a decedent either asserting or denying paternity are admissible in evidence to establish or overturn a claim of paternity. (*Pike* v. *Standage,* (Iowa) 175 N. W. 12.) If there is to be accorded more force or strength as a matter of evidence to the one declaration or the other, we would say that in accordance with legal principles a common or usual declaration by a parent that a girl is his step-daughter amounts, in effect, to a denial of paternity, and while, on the other hand, a common and usual declaration of a parent that a child is his daughter is evidence tending to prove her paternity, such expressions are not as effective to establish paternity as the other expressions are in the denial of paternity.

Again, it was more than fifty years after Ena was born that the question of her paternity came up for consideration in the probate and circuit courts. Therefore, upon the issue of fact as to whether or not she is the daughter and heir of Swigart, written or documentary evidence of the character above considered is much more reliable than the oral testimony of witnesses born sixty, seventy, or even ninety, years before the lower courts heard this case. In *Kent* v. *Manchester,* 29 Barb. 595, it is said: "Recollections are sometimes vague and impressions deceitful and illusory, but the written word stands and speaks a uniform language." Writings and documents of the character aforesaid are almost of the same high character as public records. Of public records it was well said in *Campbell* v. *State,* 206 Pac. 622: "Such records are made at a time when there is no

reason or temptation to falsify and are kept in the custody of disinterested officers." The deeds and mortgages to which we have already referred were of this character of evidence, and we have considered them as the strongest evidence on the question whether or not Swigart was married and when he was married, and particularly as to what he really thought at the times those records were made, as to the question of his marriage.

In addition to the seventeen witnesses who testified in chief for Ena, there were twenty-one other witnesses for her who testified in chief. The points made for her by those witnesses tending to show that she was Swigart's child and heir are these alleged facts testified to by them:

1. A baby girl, Ena, was born at Swigart's home on Taylor street, in Chicago, in February, 1869. Three witnesses so testified, as heretofore shown. One of them testified that witness' wife and one of her relatives, a midwife, were present when the child was born. The midwife, he stated, is dead, but so far as the record shows his wife is living and did not testify.

2. Swigart's alleged statement, "I am a daddy; my wife had a little girl." Five or more witnesses in substance so testified. Some of those witnesses also testified that before the child was born Swigart said that he was going to have a baby boy, and when it happened that the child was a girl he treated them with drinks or cigars.

3. Ena entered school in about 1875, and in 1876 to 1878, when she was seven or eight years of age, she had an impediment in her speech, but not until after she had scarlet fever. Three or more witnesses so testified.

4. Ena's mother lived in Cape Vincent with her mother a few months and then went to Chicago in about 1866 or 1867. She had no child when she went to Chicago. She returned to Cape Vincent in 1871 on a visit. She was then known as Mrs. Swigart and had a baby girl with her. Three witnesses so testified. One of them testified that

Ena's mother said she married a man by the name of Swi-
gart and had the little girl. Another one of them testified
that the little girl was in 1871 about two years old. The
third one stated that she was in 1871 about a year and a
half old, and that there was no sign of "approaching ma-
ternity" in Ena's mother before she first went to Chicago.

5. One witness gave as an explanation that Ena was
named James Ena, that Ena's mother told witness that "she
was married before and her first husband got killed, I think
a few weeks or very shortly after they got married, and
she was living with her mother-in-law; that she told her
mother-in-law [Aunt Sally Davis] that if she ever married
and had another child that she would name it after her first
husband, whether it was a girl or a boy." This witness
gives the only intimation that Ena's mother had more than
one child.

6. One other witness, Marie L. Charlette, testified that
Ena's mother told her "that her girl was born in 1869,"
about one year after witness' boy was born.

7. A number of other witnesses who stated they knew
Ena made mere guesses at her age, a number of whom were
either younger than Ena or only a very few years older
than she claimed to be, and in about every instance they
made a guess that would make Ena's birth year 1869. In
fact, this is true as to the testimony of about every one of
the thirty-eight witnesses who testified in chief for her,
most all of whom guessed at her age from her appearance.

The evidence of the thirty-one Illinois and Indiana wit-
nesses for the defendants and the written or documentary
and other evidence which we have already referred to and
discussed is just as effective an answer to the evidence of
the twenty-one witnesses for Ena, the substance of which
we have just set forth in the above seven points, as it is to
the declarations made by the seventeen witnesses who tes-
tified for Ena. With few exceptions the whole of the evi-
dence for her is really based on alleged declarations of Swi-

gart and his second wife, Louise, and of Ena's mother and of Ena herself, all of which is offset by other declarations of the same four persons, which latter declarations are testified to by the greater number of witnesses, all of whom are supported by the written and documentary evidence aforesaid.

The number of witnesses for the defendants, many of whom lived on Wolfe Island near Aunt Sally's place before and after 1865 and some of whom lived in or near Cape Vincent during that period, who testified to the knowledge of the birth of Ena at Aunt Sally's and of many other matters touching her birth and residence up to about 1873 tending to show that she was born in 1866 and is the daughter of Tom Jim Davis, is so large that we cannot extend this opinion by giving a resume of all of their testimony but will only state briefly the main points of the evidence of some of the witnesses to characterize this evidence for the defendants, as already stated. More than thirty of those witnesses, all of whom except two were born not later than 1858, testified to seeing Ena as a baby on Wolfe Island, and that she and her mother lived at Aunt Sally's in 1866, after she was born, and a number of them stated that they were there together five or six years, or up to 1871, before they finally left Aunt Sally's place. This is in accordance with the defendants' claim that Ena and her mother lived with Aunt Sally up to about the time she moved to Craighurst, Ontario, in 1871, and caused Sarah to hunt a new home or place for her and Ena to stay. Eight of the thirty or more witnesses aforesaid were blood relatives of Tom Jim Davis. One of those relatives, Margaret A. McGregor, born November 30, 1858, testified that her father was Richard A. Davis, brother of Tom Jim Davis, who was killed in December, 1865. She was at Aunt Sally's, on Wolfe Island, in 1868, and there saw Aunt Sally and Uncle Bill Davis, Sarah E. Davis and her little daughter, James Ena Davis. From Aunt Sally's she went to Oswego, New York, where

her father then lived. She came with her father and mother to Chicago in 1873. She saw Ena at her father's boat in Chicago in 1874 or 1875, with her mother. She had seen Ena often at her father's home in Chicago. Ena came to her home with her husband, Welch, just after her marriage. She learned from her father that Ena was then twenty-one years old. She identified a tintype picture of Ena which was made by a photographer at Kingston, Ontario, as shown by the photographer's printed card on the back of the tintype, and which tintype was taken from her father's album, where witness saw it two years, and she thinks three years, before they left Oswego. She did not know how long that picture had been in her father's album. Witness brought this tintype picture into court and stated it was given to her by her father, and which she thinks she first saw in his album in 1870. She also identified Ena Welch, who testified in her presence in the lower courts, as the same person that she saw on Wolfe Island as a child and who was at her father's boat in Chicago.

The testimony of Mrs. McGregor with reference to the tintype picture of Ena, and other evidence of a similar character, has such an important bearing in this record that we here insert the evidence of three other witnesses, with an explanation of the same, only one of which witnesses is included in the thirty or more witnesses for the defendants.

Mrs. Ellen Hedderson, born in 1868, a daughter of William H. Davis, who died in 1907, testified that her father gave her a tintype picture of Ena, taken when she was a little girl. She produced it in court, and it is known in the record as defendants' Exhibit 65. Witness further stated that she has had that picture ever since it was given to her by her father, and that it is not a picture that was taken out of Ena's or her mother's album or one that was given to her by Worsley in Chicago for evidence in this case. Sarah Kitchen, born in 1867, the sister of Mrs. Hedderson, testified concerning the picture of Ena, Exhibit 65, and stated

that she first saw it in her father's house when she was about eight years old, and that her father told her that it was the picture of her cousin Ena. Mary Stevenson, born in 1866, a sister of Mrs. Hedderson and Mrs. Kitchen and daughter of William H. Davis, testified as to Exhibit 65, and stated that she recognized it as the same picture of Ena which she had seen in her father's house in his album. Ena's only reply on the witness stand to the testimony of Mrs. McGregor and the three daughters of William H. Davis was a statement by her that she never saw or heard of any one of them.

The significance of the tintype pictures that were found in the albums of Richard A. and William H. Davis, both of whom died many years before Swigart died, we here state. There were two other pictures of Ena, known in the record as Exhibits 2 and 2A, that were put in evidence by Ena. Exhibit 2A, as we understand the record, is a photostatic copy of the front side of Exhibit 2 before it was despoiled. Exhibit 2 was an original tintype picture in all respects similar to the tintype pictures of Ena testified to by Mrs. McGregor and the three daughters of William H. Davis when it was originally made, and it appears clearly from the photostatic copy that the picture on it was taken at the same time the tintype pictures known in the record as Exhibits 65 and 71 for defendants were taken, Exhibit 71 being the one testified to by Mrs. McGregor. Exhibit 2 is simply the old tin-plate so blurred and spoiled that from an inspection it cannot be determined that it is a picture of anyone. It is not really contended that the photostatic copy of Exhibit 2 is not a copy of an original picture taken at the same time and by the same photographer as were the pictures referred to as Exhibits 65 and 71. Exhibits 65 and 71 as they appear in the record are tintype pictures of Ena in a paper frame, on the back of which is the card of the photographer who made them, reading thus: "J. D. Wallis, Melainotype Artist—Rooms over Parker's drug

store, on Market square, Kingston, Ont." The tin-plate (Exhibit 2) has no such paper frame on it. It is not explained in Ena's evidence how the picture (Exhibit 2) was obliterated and a photostatic copy of it made before the original tin-plate was despoiled. Albert Saunders, a witness for Ena, testified that these tintype pictures were taken in 1871, so the only real dispute about them is as to the time the photographer made them. The fact that two of these tintype pictures, one each, were found in the albums of Richard A. and William H. Davis is very significant, and we consider the exhibits on the same footing as evidence as the other writings or written documents which we have already considered. An attempt was made by Ena's counsel to show that Exhibits 65 and 71 were pictures taken from the album of Ena or of her mother by Worsley, attorney for the defendants, and the argument in this court is also to the effect that such is the fact, and that Worsley placed these tintypes in the possession of the defendants' witnesses to be used against Ena. The evidence in the record does not in any manner sustain any such charge or contention.

Eliza Ann Irwin, daughter of John Davis, a brother of Uncle Bill Davis, testified she was born on Wolfe Island in 1839 and lived on that island about forty years. She knew Tom Jim Davis from infancy. He was married to Sarah Saunders, of Cape Vincent. She visited with Aunt Sally and Uncle Bill every week from 1865 until Aunt Sally left the island. Tom Jim's wife lived with Aunt Sally and Uncle Bill after Tom Jim was killed. She knew James Ena Davis, and first saw her in bed with her mother when she was only about twenty-four hours old. Ena was christened in the school house near Aunt Sally's. She saw Ena and her mother at Aunt Sally's for five or six years after Ena was born. She talked with Sarah before she came to Chicago, and Sarah told her that Richard Davis, her brother-

in-law, had moved to Chicago from Oswego and that she (Sarah) thought he would help her.

James H. Davis, son of Richard A. Davis and nephew of Tom Jim Davis, testified that he was born in Oswego, New York, October 12, 1852, and is now living in Chicago and in the employment of the American Radiator Company as ventilating engineer. He remembers the circumstances of the death of Tom Jim Davis. During the time he lived at Oswego he visited on Wolfe Island in about 1868 and remained there several weeks. He saw Sarah Davis and her daughter, Ena, at Aunt Sally's during that visit. Ena was just a little tot at that time, and he remembers seeing her sitting at the breakfast table in her high chair at Aunt Sally's. He later saw Sarah in Oswego in 1871. She was there looking for a place of business. He had a conversation with her in which she told him that she was there to look up a place of business.

James Goslin, another of the thirty or more witnesses aforesaid, testified that he was working for Aunt Sally at the time Ena was born there to Sarah a few months after Tom Jim's death. The midwife on that occasion was a Mrs. Cadotte, and Dr. Irwin was also in attendance at Ena's birth. The midwife asked him to get a pail of water, which he did and took to the door and handed to her and then went to the barn. Carrying the pail of water to the midwife was all the help that he rendered during the time Sarah was giving birth to Ena. About three days after the child was born the midwife showed it to him. Aunt Sally and Ena's mother a short time thereafter talked to him about the child and asked him how he liked the looks of it. He continued to work at Aunt Sally's about a year after Ena was born. He did not know his age, but stated that Tom Jim was killed after the Civil War and that he was about thirteen years old when Tom Jim was killed.

Another of those witnesses, Marinda Tait, born in 1836, testified that she knew Aunt Sally and Uncle Bill Davis and

Tom Jim Davis very well. They lived on the front row on Wolfe Island, opposite Channel Grove on Simcoe Island. Witness and her husband lived next door west of them. Tom Jim was a leader in everything in the way of amusement that was going on in Kingston, Cape Vincent and on Wolfe Island. Everybody knew him, and it was said "there was no fun where Tom Jim isn't." He was a splendid dancer and all the girls were glad of a chance to dance with him. He married Sarah Saunders, of Cape Vincent. They lived together at Aunt Sally's until he met his sudden and unfortunate death at Cape Vincent. A short time after his death a child was born to Sarah, and it looked very much like Tom Jim, its father, and was christened in the school house nearby. The child was running around at Aunt Sally's about three or four years before her mother left there and went to Cape Vincent. She further stated that Tom Jim had the largest funeral she ever saw. The reason she gave for having so clear a recollection of him was because he was so well liked by everybody and was an outstanding character on the island. For the same reason she remembered his wife and child.

Benjamin Longueiul, born on Wolfe Island in 1856, testified that he knew Aunt Sally and Uncle Bill Davis and Tom Jim Davis. Witness lived with his grandmother, about the third or fourth house west of Aunt Sally. He visited her often and saw Tom Jim frequently. He spoke of him as a splendid dancer and a very popular "leader in everything going," and that the girls were fond of him. He was stabbed in the neck and killed at Cape Vincent on December 7, 1865, by a man named Billy Warren. Tom Jim's body was landed from the steamer Watertown at the shore near Aunt Sally's. He saw the wound in his neck as he lay in his coffin at the dance hall. He had a tremendous funeral. He remembered well that his widow had a baby not long after his death and funeral and that the baby's name was Ena. He often played with Ena. Her mother was

proud of her and took good care of her. Ena was accustomed to sit on the stile on the front fence at Aunt Sally's, with her arms around the neck of a dog called Ponto. He described her as a fine-looking girl, plump featured and attractive. He saw her at Aunt Sally's with her mother until she was five or six years old, and remembers, as did a great many others of the thirty or more witnesses, that she had an impediment in her speech and would stutter or lisp, and that she had a cute way of talking that was attractive.

William J. Gates, another of the witnesses, a resident of Kingston, Canada, who was born in 1844 on Gates Island, near Wolfe Island, testified to taking Uncle Bill Davis home one night in 1869 when he was drunk. He stayed all night at Aunt Sally's. He stated that there was a baby girl in the next room in which he slept that cried in the night; that Uncle Bill was a very noisy man, "and between the two of them it made quite a bit of amusement." He further stated that he was introduced to Sarah by Aunt Sally as her daughter-in-law. Sarah said at the breakfast table that morning that she had never "had any such night, between the child crying and the old man making noise." The girl (Ena) sat at the table with the family at breakfast and was "going on four years old."

Daniel Staley, seventy-five years old, was born on Wolfe Island. He was at one time chairman of the municipal council of Wolfe Island. He testified that his home was near the school house near Aunt Sally's. He remembered Tom Jim Davis and Sarah and her little girl, James Ena Davis. When he first saw Ena she was a baby in her mother's arms, and he saw her about Aunt Sally's place "some three or four years anyway." Mrs. Harriet Spoor, born October 18, 1850, a sister of Staley, gave testimony similar to that of her brother.

Harriet Spoor Beaupre, of Kingston, born on Wolfe Island on July 23, 1849, testified that she knew Aunt Sally and Uncle Bill Davis and had known them since childhood.

They lived a short distance from her house on Wolfe Island, "a few rods away." They had three boys: William H., commonly called Billie Bowe, Richard A. and Tom J., commonly known as Tom Jim. She knew Tom Jim from the time she was very young and saw him often. She had to pass Aunt Sally's and Uncle Bill's door, where Tom Jim lived. He was killed about the close of the Civil War. She saw his body in the ball room at his mother's home after he was dead. She knew his wife, Sarah Saunders, before he married her. She came from Cape Vincent. One child was born to Tom Jim and Sarah after his death, and her name was James Ena Davis. Witness saw her nearly every day while going back and forth to school, the school being near Aunt Sally's, and saw her there until she was about four or five years old. She did not speak distinctly. Witness remembers that one day she said to witness' mother, "Metapa, I don't like your Ben." Witness' mother asked her why, and she said, "Well, he tall me names; he a cow." Witness further stated that it was the quaint sayings of Ena that impressed the child on her memory so that she could not forget her. She saw her at Aunt Sally's up to about 1871, when she saw and began to take notice of her with reference to her peculiarity of speech. The boy's name that Ena spoke of as not liking was Ben Longueiul, who also testified as a witness.

Lucinda Pike, eighty-five years old, born in 1839, testified that she is a resident of Wolfe Island and knew Uncle Bill, Aunt Sally and Tom Jim Davis, and spoke of their popularity and notoriety in very much the same manner as Marinda Tait and Benjamin Longueiul. She knew about Tom Jim's tragic death and knew his wife that was widowed. She met her at Cape Vincent and talked with her about her child. There was a child born to her soon after the death of Tom Jim. Aunt Sally said the child should be named James Ena. She saw this child at Aunt Sally's house. Later Mrs. Tom Jim Davis opened a millinery at

Marysville, on Wolfe Island, and witness was in the store more than once and saw the same little girl there. She remembered particularly well that the child had some sort of impediment in its speech which caused her to stutter or lisp.

In addition to the thirty or more witnesses aforesaid there were quite a number of witnesses whose testimony in the first part of this opinion we have referred to as pedigree evidence. Three or more witnesses testified to hearing Aunt Sally Davis tell of Ena's being born at her house to Sarah as the child of Tom Jim. One or more witnesses told of hearing Uncle Bill, with Ena on his lap, declare that she was Tom Jim's daughter by Sarah. Two or more witnesses told of William H. Davis' declarations to the effect that there was a child called Ena born at Aunt Sally's to Tom Jim's widow after Tom Jim's death, and stating that she was Tom Jim's daughter. There were quite a number of witnesses who testified to the declarations of Joseph Saunders, who died long before Swigart, to the effect that Ena was the daughter of Tom Jim and Sarah. Seven witnesses testified to seeing Ena as a young lady seventeen or eighteen years of age, when she visited her uncle, Joseph Saunders, in 1883 or 1884. At that time she was known as James Ena Davis and was introduced by Saunders to a number of people on the island and vicinity as the daughter of Tom Jim. Among those witnesses was Alice Duffy, born on Wolfe Island and who lived on it all of her life, ninety years of age when she testified, who stated that she was acquainted with William and Sarah Davis, known as Uncle Bill and Aunt Sally, and that they kept a store, a dance hall and a resort on the St. Lawrence river. She knew Tom Jim Davis very well, and referred to him as a noted character and leader in all social functions. She heard of his death in December, 1865, and the fact that he was brought back to Wolfe Island and buried. There was great excitement at that time about his death. She lived about three miles away from Aunt Sally's place and did not visit there very

often, and stated that everyone in the neighborhood knew that there was a baby daughter born to Tom Jim's wife shortly after his death. Several years after those events Joseph Saunders, a brother of Ena's mother, introduced Ena to witness and told her that her name was Ena and that she was the daughter of Tom Jim. Saunders asked her if she remembered Tom Jim, and she told him that she certainly did. Ena was then a young lady and appeared to be eighteen or twenty years old and was very handsome. She was a large, full-faced girl and had an impediment in her speech. Witness does not remember ever seeing Ena after the time when they were at her house and later drove away.

Etti Allum was born on Wolfe Island in 1870, where she still lives with her husband, owning a farm of 200 acres. She was the sister of Emma Boyden and knew Ena when she was at Joseph Saunders on her visit in 1883 or 1884. Ena was then seventeen or eighteen years old—a "young lady fully developed, as I remember her." When Ena returned to Chicago she sent witness her picture, which was introduced in evidence as Exhibit 81. She further stated that as near as she could remember she got this photograph from Ena the winter after she returned home. We have examined this picture in the record, and it shows Ena to be, from all appearances, a full-grown and well-developed young lady. Ena testified that this visit was made in 1881, when she was twelve years old, and that that was the last time she was ever on Wolfe Island. Alfred A. Saunders, her uncle, also testified that this visit of Ena's was made in 1881, after he visited Swigart's family, and that Ena went back with him to Canada during that year. He also stated that Ena "appeared to be twelve or thirteen years old in 1881." The picture to which we have referred as Exhibit 81, in our judgment cannot be that of a girl twelve or thirteen years old.

Emma Boyden, formerly the wife of Joseph Saunders, who died on Wolfe Island eleven years before she testified, stated that Ena visited her and Joe Saunders on Wolfe Island in 1883. She fixed the date by referring to a picture of her children which Ena had made at Kingston during that visit. Ena told her that she was seventeen years of age on that visit. At the time the picture was taken witness' youngest child, born in 1882, was one year old. Her husband told her that Ena was born at Aunt Sally's shortly after Tom Jim's death. Ena told her on that visit that she did not like Swigart. She called him Swigart. Ena visited witness in Kingston in 1913, when Ena was with the Madam Sherry Show. She gave witness a ticket to the show and after it was over asked her how she liked it.

Joseph P. Gratton, sixty years of age, testified that he lives in Kingston and has lived in Canada all his life. He is superintendent for James Richerdson & Sons, grain elevator and grain merchants at Kingston, and had been in their employ about forty-five years. On January 15, 1902, Ena and four other young women, all members of the same show troupe, came to his elevator. Ena asked him if she could go through the building. He replied, "Sure," and then went to the top of the elevator with them. There were windows on the top floor of the elevator looking in all directions, from one of which Wolfe Island could be seen. Ena, when on the top floor, asked him where Wolfe Island was. He pointed it out to her, and when he said to her, "That is Wolfe Island," she said to him, "I was born on Wolfe Island." He saw her write her name in the weighbook of the elevator. The sheet of that weigh-book on which Ena wrote was introduced in evidence, and on it appears the following, written by her: "Jan. 15th 1902 Ena Welch, Dolly Varden Company—N. Y. City." Another one of the young ladies with Ena wrote her name close to Ena's name on that same page as Madge Howard. Witness saw Ena write all of the foregoing on that page

except the name "Madge Howard." It was the statement to him by Ena that she was born on Wolfe Island that caused him to remember particularly the name Welch. It appears further from his testimony that some of the other girls of the troupe wrote their names in the weigh-book but erased their names "after thinking better of it."

In rebuttal of Gratton's testimony Ena testified that she was in Kingston in 1902 in an elevator. She stated that she did not say to Gratton, after asking him where Wolfe Island was, "I was born on that island." She then stated: "As near as I recollect I was there with three or four girls of the company, and I think we went up in this elevator. There was a man standing there. I don't know who he was. I think I asked him something about an island, * * * and he said, 'I think that is Howe Island.' I said, 'Where is Wolfe Island?' He said, 'That is it right over there.'" She stated that she then made "the casual remark that my mother lived there and that I had been over there when I was a little girl, and that is about all."

The significant statement that Gratton made, to the effect that Ena told him she was born on Wolfe Island, is only denied by Ena, and she admits that she asked him to point out Wolfe Island. There were at least three other members of her show troupe with her, according to the testimony of both Gratton and Ena, that might have been important witnesses. Their absence is not accounted for or explained.

We have heretofore referred to the contents of the certificate of the death of Sarah E. Swigart, and to the fact that it was proved that the facts set forth in the certificate were given by Swigart to the undertaker. In other words, they were the proved declarations of Swigart reduced to writing by the undertaker. This death certificate was offered in evidence by the defendants but was erroneously excluded by the circuit court. Ena depends in this case upon the alleged declarations of Swigart to establish three

facts essential to decision in her favor: That her mother went to Chicago and began living with Swigart in 1868; that she was born in 1869 as the illegitimate daughter of Swigart and her mother; and that her mother and Swigart were legally married in about 1892. Therefore all of Swigart's declarations tending to establish or to disprove any one of the three material facts are clearly admissible. Swigart made one declaration in the death certificate that tends to refute or deny the truth of two of the three alleged facts—his declaration that Sarah E. Swigart had lived in this State twenty-two years previous to her death. This declaration tended to establish the claim of the defendants that he never met Sarah in Chicago until 1873, as it is also proved, without question, that she died in 1895. The defendants also contend that the court committed many other errors by its restriction of the defendants' right to cross-examine Ena and various other witnesses. We have already indicated that the court committed many errors in that regard, but inasmuch as the judgment of the Appellate Court must be affirmed we do not deem it necessary to further discuss the rulings of the court. We will further say that in affirming the judgment of the Appellate Court it is not necessary for us to consider the declaration of Swigart that Sarah had lived in the State only twenty-two years, and we have not taken it into consideration in making our decision.

It was shown that there was no record of either the birth of Ena or of her christening on Wolfe Island at the school house near Aunt Sally's. It was further shown that the Canadian law requiring records of births to be made and kept was passed in 1859, but it was also shown that the first birth record made on Wolfe Island was made in 1869, and therefore there were no such records kept in 1866. There was produced in court what purported to be the private record of the christening of infants on Wolfe Island by the local minister during the year 1866. The evidence of one

or more of the witnesses for the defendants is to the effect that Ena was christened by a traveling minister. On the other hand, so far as this record shows there are no records or writings extant showing the birth of Ena in Illinois or the marriage of her mother and Swigart, or that tend to prove either of those facts, other than the deed records to which we have already alluded. The entire case for Ena is made by the oral testimony of herself and her witnesses and is not supported by any writing or document in existence, so far as the record discloses. There was an attempt to show by the testimony of a number of witnesses that Swigart had in his home a very large Bible, a medium-sized Bible and a small Testament, and that in the small Bible there was a showing that Ena was born in 1869 and that her name was written therein as Ena Swigart. A witness for the defendants produced in court a Bible which the defendants claimed was the same small Bible referred to by Ena's witnesses, and the proof tends to show that the large Bible was Swigart's and that the smaller Bible was Emma Swigart's. We have considered this Bible evidence fully and carefully, and it is not at all convincing to us that any Bible in Swigart's home ever had Ena's name recorded in it as Ena Swigart or her birth date as in 1869. There is a great deal of evidence by both sides with regard to those Bibles, but we do not deem a further discussion of it necessary to a proper decision in the case.

There were also quite a number of witnesses who were residents or former residents of Wolfe Island and vicinity who testified in rebuttal for Ena. Their evidence was generally to the effect that they never knew or never heard of a child being born to Sarah E. Davis at Aunt Sally's after Tom Jim's death. In other words, their evidence is negative in character, and there were not any considerable number of them whose testimony showed that they had the opportunity of the defendants' witnesses to know the exact facts. Some of those witnesses went into some detail in

their evidence concerning another girl on that island who was born and reared on it and whose name was Georgena Davis, according to the testimony of a great many of the witnesses for both sides, who was the daughter of Willard Davis. An attempt was made by Ena and her counsel to show that the Wolfe Island witnesses for the defendants really had in mind this girl, Georgena Davis, when they were giving their testimony. A consideration of the evidence discloses the fact that the witnesses for the defendants, or many of them, knew both Ena Davis and Georgena Davis, and it appears from all of the evidence that Georgena was born in 1859 and that she was seven years old in 1866, the year in which the defendants' witnesses say Ena was born. Moreover, the testimony of one of the witnesses for Ena makes it clear that there was no such confusion of the witnesses, the substance of whose testimony we now give.

Theodore Briggs, born on Wolfe Island on November 5, 1849, now living at Calgary, Canada, testified by deposition that he lived on Wolfe Island until he moved to Calgary twelve years ago. He used to drive the stage from Kingston to Cape Vincent in the winter and knew all the islanders pretty well, including Tom Jim Davis and Sarah Saunders, who were married about the close of the Civil War. He never knew of her giving birth to a child on Wolfe Island. "I am not swearing that she was pregnant or not; I would not take an oath like that." After Sarah left the island she went to Chicago and came back on a visit and had with her a little white-headed girl probably two or three years old which she called her child, "and which I saw running around at Aunt Sally's." He knew Willard Davis, who had a daughter by the name of Georgiana. "I remember we called her Ena—at any rate we called her Georgia Ena." She married a young fellow named George Staley. She was a big girl, over six years old, "before I saw the little girl at Aunt Sally's; there is no doubt in the world about it; there would be no occasion for confusing the girl known

as Georgia Ena with the little girl at Aunt Sally's; I heard, at the time Sarah came back on a visit to Aunt Sally's, that she had done well in Chicago and married a rich man's heir; I don't know who first told me that Swigart was a German, but since this case came up they said it was a rich German she married in Chicago."

The testimony of Briggs is confirmatory of the fact that Ena was on the island at Aunt Sally's when she was a little girl, just where all the witnesses of the defendants testified that she was. The testimony in the record, outside of that of Briggs, does not show or tend to show that Swigart was a rich man's heir, but, on the other hand, it seems to show that he started his career in moderate circumstances and made his money by hard work and by being unusually parsimonious and saving. Briggs' testimony is apparently affected somewhat by many things that he had heard a short time before he gave his deposition.

We have considered carefully the entire testimony in the two abstracts in the record of more than 1350 pages. There were seventy-four witnesses who testified for Ena in chief and in rebuttal. Those witnesses were greatly outnumbered by the witnesses for the defendants. The character of the evidence of the defendants' witnesses is such as to brand a large majority of them as deliberate perjurers if Ena was not born on Wolfe Island in 1866 as the daughter of Tom Jim and Sarah E. Davis. They had the opportunity to know the real truth concerning those facts. They are corroborated by all of the written and documentary evidence that is found in this record and that actually existed when the evidence was heard. With this showing in the record our finding must necessarily be that the judgment of the circuit court is manifestly against the weight of the evidence.

The judgment of the Appellate Court is therefore affirmed.

*Judgment affirmed.*

Mr. JUSTICE FARMER, dissenting:

The decision of this case depends principally upon the facts. I have read all the evidence carefully and cannot agree with the opinion of the court. The crux of the case depends upon whether plaintiff in error was born on Wolfe Island in 1866 or in Chicago in 1869. Most of the witnesses were quite aged, as they necessarily must have been to testify to facts occurring so long ago. The evidence was highly conflicting. Many of the witnesses were either mistaken in their testimony or willfully testified falsely. If plaintiff in error was born on Wolfe Island in 1866 then she could not have been the daughter of Swigart; if she was born in Chicago in 1869 then she was the daughter of Swigart and the mother of plaintiff in error, who were living together as man and wife. The reliable evidence proving she was born in Chicago in 1869 convinces me of its truth. Swigart was not an admirable man in character and conduct. He drank intoxicating liquors to excess, was parsimonious and not very kind to plaintiff in error or her mother or the second wife he married. This, I think, reasonably explains certain discrepancies in the testimony relied on to prove plaintiff in error was born on Wolfe Island. In my opinion all the contradictions and discrepancies in the evidence are reasonably explained consistently with plaintiff in error's claim to have been born in Chicago. If she was born in Chicago she was the daughter of Swigart by the woman with whom he was living as a wife, whom he claimed to be his wife and whom he buried as such.

There is considerable evidence in the record of defendants in error to which I cannot attach much weight. I have not the time or physical ability to go into it in detail. The trial court heard the evidence, saw the witnesses, and had a better opportunity to judge of the weight and credibility of their testimony than a reviewing court. The decree found that plaintiff in error was the daughter of

Swigart, born in Chicago in 1869, and I am convinced that a reviewing court is not authorized to say that the decree was palpably contrary to the weight of the reliable testimony. In my opinion the judgment of the Appellate Court should be reversed and the decree of the circuit court affirmed.

Mr. JUSTICE THOMPSON, also dissenting.